IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**MICHELE L. SELYAK**                     Case No. 1:17 CV 1627

      Plaintiff,                              Judge John R. Adams

      v.                                     Magistrate Judge James R. Knepp, II

**COMMISSIONER OF SOCIAL SECURITY,**

      Defendant.                             REPORT AND RECOMMENDATION

## INTRODUCTION

Plaintiff Michele L. Selyak ("Plaintiff") filed a Complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision to deny disability insurance benefits ("DIB") and supplemental security income ("SSI"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). This matter has been referred to the undersigned for preparation of a report and recommendation pursuant to Local Rule 72.2. (Non-document entry dated August 3, 2017). Following review, and for the reasons stated below, the undersigned recommends the decision of the Commissioner be reversed and remanded for further proceedings.

## PROCEDURAL BACKGROUND

Plaintiff filed for DIB in March 2014, alleging a disability onset date of July 15, 2004. (Tr. 161-63). Her DIB claim was denied initially in May 2014 (Tr. 107, 111), and on reconsideration in September 2014 (Tr. 115). The day after her DIB reconsideration denial in September 2014, Plaintiff filed for SSI, again alleging a disability onset date of July 15, 2004. (Tr. 170). Plaintiff then requested a hearing before an administrative law judge ("ALJ"). (Tr. 120). Plaintiff

(represented by counsel), and a vocational expert ("VE") testified at a hearing before the ALJ on March 8, 2016. (Tr. 47-90). On May 4, 2016, the ALJ found Plaintiff not disabled (for purposes of both DIB and SSI) in a written decision. (Tr. 19-35). The Appeals Council denied Plaintiff's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-6); *see* 20 C.F.R. §§ 404.955, 404.981, 416.1455, 416.1481. Plaintiff timely filed the instant action on August 3, 2017. (Doc. 1).

## FACTUAL BACKGROUND

Plaintiff was born in 1976, making her 28 years old on her alleged onset date. *See* Tr. 149, 163. She alleged disability due to schizophrenia and bipolar disorder. (Tr. 194).

Relevant Medical Evidence[1]

*Evidence Prior to Plaintiff's Date Last Insured*

There is no mental health treatment evidence prior to Plaintiff's date last insured of March 31, 2009. During the time period from December 2005 through March 2009, Plaintiff was treated for several physical health complaints. *See* Tr. 246-49, 253, 256-59, 260-65, 267-68, 273-75, 310, 312-13, 315, 317-21, 323-26, 329, 332.

*Evidence after Plaintiff's Date Last Insured, but Prior to SSI Application*

In November 2013, Plaintiff sought mental health treatment at Beacon Health after an incident with the police, and subsequent hospitalization. (Tr. 412). She had been diagnosed with schizoaffective disorder, and prescribed medication. *Id.* Plaintiff reported no limitations in activities of daily living. *Id.* She reported no past mental health treatment, and was taking Latuda.

---

1. Plaintiff challenges the ALJ's determination regarding her mental impairments. Although there is also evidence of medical treatment for physical issues in the record, the undersigned summarizes only that evidence relevant to Plaintiff's arguments here. *See Kennedy v. Comm'r of Soc. Sec.*, 87 F. App'x 464, 466 (6th Cir. 2003) (issues not raised in opening brief are waived).

(Tr. 414). The social worker assessed schizoaffective disorder, not otherwise specified, and a Global Assessment of Functioning ("GAF") score of 60.[2] Under "severity of illness", the provider indicated Plaintiff was "markedly ill" compared to others. (Tr. 424).[3] Plaintiff was started on a trial of Seroquel (Tr. 423), but quickly discontinued due to side effects (Tr. 425). She was started on Zyprexa. *Id.*

In December 2013, Plaintiff saw Maryam Niazi, PMHNP-BC, at Beacon Health. (Tr. 410-11). Ms. Niazi noted Plaintiff's ability to focus and finish a task was improved on Zyprexa, as was her ability to converse without preoccupation. (Tr. 410). Ms. Niazi opined Plaintiff was "moderately ill", and planned to increase Plaintiff's Zyprexa dosage slowly to 12.5 mg every other day or every day. (Tr. 411).

In January 2014, Plaintiff saw Timothy Warneka, PCC-S, for a counseling session. (Tr. 408-09). He observed Plaintiff presented as both immature and mature at the same time; she was cognitively mature regarding intellectual pursuits, but socially and developmentally somewhat immature. (Tr. 408).

---

2. The GAF scale represented a "clinician's judgment" of an individual's symptom severity or level of functioning. Am. Psych. Ass'n, *Diagnostic & Statistical Manual of Mental Disorders,* 32–33 (4th ed., Text Rev. 2000) ("*DSM–IV–TR*"). "The most recent (5th) edition of the Diagnostic and Statistical Manual of Mental Disorders does not include the GAF scale." *Judy v. Colvin,* 2014 WL 1599562, at *11 (S.D. Ohio); *see also* Diagnostic and Statistical Manual of Mental Disorders 16 (5th ed. 2013) ("*DSM–V*") (noting recommendations "that the GAF be dropped from [DSM–V] for several reasons, including its conceptual lack of clarity...and questionable psychometrics in routine practice"). However, a GAF score of 51–60 "indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks), or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *Kornecky v. Comm'r of Soc. Sec.,* 167 F. App'x 496, 503 (6th Cir. 2006) (citing *DSM–IV–TR*).

3. The Beacon Health treatment forms contained a question regarding the "Clinical Global Impression Scale (CGI-S)". *See, e.g.,* Tr. 411. It asked the question: "Considering your total clinical experience with this particular population, how mentally ill is the patient at this time?" *Id.* Responses ranged from one to seven, with one corresponding to "[n]ormal, not at all ill", and seven corresponding to "[a]mong the most extremely ill patients". *Id.* Relevant to Plaintiff's case, four corresponded to "[m]oderately ill" and five corresponded to "[m]arkedly ill." *Id.*

Plaintiff also saw Ms. Niazi in January 2014. (Tr. 406-07). Plaintiff reported she was not preoccupied with voices; she was able to carry on a conversation and respond to questions when asked. (Tr. 406). She reported problems sitting still. *Id.* Ms. Niazi observed Plaintiff was cooperative, clean, her thought process was easy to follow, and her mood/affect was good. *Id.* Ms. Niazi again noted Plaintiff was "moderately ill" and planned to start her on Inderal. (Tr. 407). Later that month, Plaintiff returned to Ms. Niazi for counseling. (Tr. 404-05). Ms. Niazi again noted Plaintiff was cooperative, able to have a conversation, her thought process was "easy to follow", and her mood/affect was "stable." (Tr. 404). Ms. Niazi again assessed Plaintiff as "moderately ill" and noted she was "stable overall". (Tr. 405). She assessed a GAF score of 55. *Id.*

In February 2014, Plaintiff returned to Mr. Warneka. (Tr. 400-01). Plaintiff's mother expressed concern that Plaintiff had declined the services of a case manager to assist in applying for disability. (Tr. 400). Mr. Warneka helped Plaintiff understand the need to apply for food stamps and disability. *Id.* Plaintiff insisted she was ready to work, though her mother disagreed. *Id.* Mr. Warneka encouraged Plaintiff to practice getting up, getting dressed, and going to the library every day for two hours to test whether she was capable of working. *Id.*

Plaintiff also returned to Ms. Niazi in February 2014, reporting an inability to sit still in the evenings. (Tr. 398). Ms. Niazi again noted Plaintiff's thought process was "easy to follow", mood/affect was "good" and behavior was cooperative. *Id.* Plaintiff returned to Mr. Warneka the following day, and reported she had not done the practice to prepare for work. (Tr. 395).

Plaintiff saw Kristy Mowry, MA, LSW, Community Liaison, on three occasions in March 2014, to assist with completing a disability application. (Tr. 391-94, 385).

In March 2014, Plaintiff returned to Ms. Niazi, reporting she was "feeling better" on her current medications. (Tr. 381). Her thought process was a little delusional, and her behavior was

4

cooperative. *Id.* She had thoughts of self-harm, but no plan, and was having visions of knives. *Id.* Her mother was asked to take the knives away. *Id.* Ms. Niazi again noted Plaintiff was "moderately ill". (Tr. 382).

In April 2014, Plaintiff returned to Ms. Niaz, reporting a decrease in depression (3/10), though her mother thought she was more depressed. (Tr. 378). Ms. Niazi noted Plaintiff was clean, with an easy to follow thought process, was cooperative, and had an "okay" mood/affect. *Id.* Her plan was to increase Zoloft. (Tr. 379). She noted Plaintiff was "markedly ill". *Id.*

Later that month, Plaintiff had her final counseling session with Mr. Warneka, who noted all her counseling goals had been met. (Tr. 376). However, Plaintiff was unable to identify any gains made or how counseling has helped her. *Id.* Plaintiff reported things were "going well" and she was consistently taking her medication. *Id.*

In May 2014, Plaintiff returned to Ms. Niazi, reporting she was "emotionally in a better place than 5-6 weeks ago" after taking Zoloft. (Tr. 459). She was, however, "still down" because she wanted to have a job and had not yet found one. *Id.* Ms. Niazi noted she would increase Zoloft. *Id.*; Tr. 464. She again opined Plaintiff was "markedly ill". (Tr. 464).

In June 2014, Plaintiff reported to Ms. Niazi that she was less agitated and in a "happier mood" since the increase in Zoloft. (Tr. 457). Ms. Niazi again noted Plaintiff was clean, her thought process was easy to follow, her mood/affect was good, and her behavior cooperative. *Id.* She noted Plaintiff was "moderately ill." (Tr. 465).

*Evidence after SSI Protective Filing Date*

In July 2014, Plaintiff reported auditory hallucinations to Ms. Niazi. (Tr. 454). She heard the voices of her past bosses, sometimes talked back to them, but did not remember what they said. *Id.* Ms. Niazi again observed Plaintiff's thought process was easy to follow, her mood/affect was

okay, and she was cooperative. *Id.* Ms. Niazi noted the auditory hallucinations were new. (Tr. 455). She assessed a GAF score of 50, and noted Plaintiff was "markedly ill". *Id.*

In August 2014, Plaintiff returned to Ms. Niazi with her mother. (Tr. 452-53). She reported feeling the same as her last appointment, and that her depression was related to being bored. (Tr. 452). Ms. Niazi noted Plaintiff was cooperative, and her thought process was easy to follow. *Id.* She continued to have auditory hallucinations, and depression (rated 2/10). (Tr. 452-53). Ms. Niazi advised Plaintiff to increase her activity level. (Tr. 453). The next month Plaintiff reported continued auditory hallucinations. (Tr. 450). Ms. Niazi noted Plaintiff's thought process was "easy to follow, but [she] withholds info", her mood/affect was okay, and her behavior was cooperative. *Id.* She again noted Plaintiff was "markedly ill". (Tr. 451).

Plaintiff returned to Ms. Niazi in November 2014. (Tr. 447-48). She was still looking for employment. (Tr. 447). She had no auditory hallucinations ("not even mumbley"). *Id.* She was sleeping a lot. *Id.* Her mood/affect was "okay", she was cooperative, and her thought process was "easy to follow." *Id.* Ms. Niazi again noted Plaintiff was "markedly ill". (Tr. 448).

In January 2015, Plaintiff reported sleeping and sitting on the couch a lot. (Tr. 445). Ms. Niazi made similar mental status observations as before. (Tr. 445-46).

In February 2015, Plaintiff reporting sometimes feeling sad and lonely because she was not married. (Tr. 443). Ms. Niazi noted Plaintiff's lonely mood, but that her cognition was good, thought process was easy to follow and that her behavior was "okay". *Id.* She assessed Plaintiff as "markedly ill." (Tr. 444).

Plaintiff returned to Ms. Niazi in June 2015, denying depression (she stated: "It lifted"). (Tr. 440). Plaintiff's mother reported she was more talkative, and Ms. Niazi noted Plaintiff did not

have delusional thought content or auditory hallucinations. *Id.* Her mental status examination was similar to before, and Ms. Niazi decreased her Inderal. (Tr. 440-41).

In July 2015, Plaintiff (accompanied by her sister) saw Ms. Niazi. (Tr. 438). Her affect was "down/quiet", and Ms. Niazi noted her father had passed away two days prior. *Id.* Her sister reported Plaintiff was sleeping a lot. *Id.* Ms. Niazi encouraged Plaintiff to get out of the house and go for a walk so that she was not "in bed all the time." (Tr. 439). Later that month, Plaintiff (accompanied by her mother), returned to Ms. Niazi. (Tr. 436-37). She was grieving the loss of her father, but feeling okay. (Tr. 436). Her mental status exam was relatively unchanged, and she was still considered "markedly ill". (Tr. 436-37).

In August 2015, Plaintiff saw Nancy Pane, LPCC, at Beacon Health for the first time. (Tr. 434-35). Her goal was: "I want to feel better." (Tr. 434). Ms. Pane noted Plaintiff appeared to take her father's death "in stride" and said "he'll be missed" without any emotion. *Id.* Plaintiff reported auditory hallucinations and drinking "several" beers per week to "quiet" the voices. *Id.* She was well-groomed with average demeanor, avoidant eye contact, average speech, and average activity. *Id.* She had no delusions, but reported non-command auditory hallucinations. *Id.* She had a logical thought process, clear speech, euthymic mood, constricted affect, and cooperative behavior. (Tr. 434-35). She was estimated to have average intelligence. (Tr. 435).

At her next visit later that month, Plaintiff reported to Ms. Pane that she "want[ed] to have a better frame of mind." (Tr. 432). She also reported negative thoughts when bored. *Id.* She again described auditory hallucinations that said "silly things". *Id.* Ms. Pane observed average eye contact, normal speech, a withdrawn demeanor, no delusions, logical thought process, cooperative behavior, non-impaired cognition, constricted affect, and above average intelligence. (Tr. 432-33).

Plaintiff returned to Ms. Niazi in August 2015; she denied feeling depressed or anxious. (Tr. 429). Ms. Niazi noted no auditory hallucinations. *Id.* Her mental status examination was similar to before and Ms. Niazi again opined she was "markedly ill." (Tr. 429-30).

Plaintiff saw Ms. Pane twice in September 2015. (Tr. 426-28). At the first visit, Ms. Pane noted Plaintiff's "thoughts tend toward depressive patterns when bored." (Tr. 427). Plaintiff still hoped for a job in her field. *Id.* Plaintiff reported some audio and olfactory hallucinations and "[s]ome paranoia ideation but mild." *Id.* She also reported hearing "'babbling' vs. commands to harm herself or others." *Id.* Ms. Pane observed Plaintiff had persecutory and obsessional thoughts, grandiose thought content, constricted affect, and a depressed mood. (Tr. 427-28). She also, however, had average: demeanor, eye contact, and activity. (Tr. 427). Her speech was clear. *Id.* At the second visit, Ms. Pane observed euthymic mood, full affect, and cooperative behavior. (Tr. 426).

*Opinion Evidence*[4]

In July 2014, Ms. Niazi completed a medical source statement for the state agency. (Tr. 350-52). In it, she noted she had seen Plaintiff from November 2013 through July 2014. (Tr. 351). Plaintiff's diagnoses were schizoaffective disorder, obsessive compulsive disorder, and rule out bipolar I disorder, with psychotic features. (Tr. 350). Regarding Plaintiff's mental status, she noted Plaintiff's appearance was "clean" and her flow of conversation and speech was "goal oriented[,] but realities are somewhat disturbed due to auditory hallu[cinations]." (Tr. 351). Plaintiff's mood and affect were "appropriate" and she had no symptoms of anxiety. *Id.* Regarding thinking

---

4. In both May and August 2014, state agency physicians reviewed Plaintiff's records and concluded there was insufficient evidence to evaluate the DIB period from July 14, 2004 through March 31, 2009. (Tr. 93-94, 103-04).

disorders, Ms. Niazi noted: "Disturbed due to psychotic features—excessive auditory hallucinations. *Id.* Ms. Niazi observed Plaintiff had "poor concentration, poor abstract reasoning due to auditory hallucinations." *Id.* She also noted Plaintiff was well-behaved, but had "poor judgment, disturbed reality". *Id.* In her medical source statement, Ms. Niazi opined Plaintiff could perform "simple tasks only", maintain attention for a "short period of time", and her ability to sustain concentration and persist at tasks would be "disturbed [at] times due to voices." (Tr. 350). She opined Plaintiff was "okay" at social interaction, and did not know about her adaptation deficiencies. *Id.* She thought Plaintiff could "maybe . . . do tasks [that are] repetitive & simple". *Id.*

Also in July 2014, Ms. Mowry completed a Daily Activities Questionnaire at the request of the state agency. (Tr. 211-12). She noted she had seen Plaintiff seven times from February through May 2014, and her role was to assist with Plaintiff's disability application. (Tr. 212). She explained that Plaintiff "ha[d] trouble following through with tasks" was "disorganized" and lacked self-motivation. *Id.* She noted Plaintiff reported having lost her job due to a grant ending, but per her mother, "she had a verbal altercation with her boss, and was escorted out." *Id.* For examples of things that might prevent Plaintiff from working, Ms. Mowry noted: "[l]ack of job etiquette, low energy, poor sense of self awareness and how her diagnosis affects her presentation." *Id.* Ms. Mowry noted Plaintiff was able to prepare simple foods, could do household chores ("when told, slow"), made poor choices when shopping, had poor credit, and was able to drive herself to appointments." (Tr. 212). She also noted Plaintiff was "better" at these things "when she is on her meds per family report." *Id.* Ms. Mowry also observed Plaintiff had no problem keeping her appointments, and that her mother "guides and directs her." *Id.*

9

In October 2015, Ms. Pane completed a "Mental Impairment Questionnaire." (Tr. 354-57). She reported seeing Plaintiff weekly since August 2015. (Tr. 354). She listed schizophrenia and major depression as Plaintiff's diagnoses. *Id.* Her clinical findings included auditory hallucinations, delusions, and depression. *Id.* Ms. Pane checked numerous symptoms on a checklist. *See* Tr. 355. Regarding Plaintiff's functional limitations, Ms. Pane opined Plaintiff had moderate restrictions in activities of daily living and moderate to marked limitation in maintaining social functioning. (Tr. 356). She did not offer an opinion as to Plaintiff's degree of limitation in maintaining concentration, persistence, or pace. *Id.* She checked a box indicating Plaintiff had three episodes of decompensation within a twelve-month period, each of at least two weeks duration. *Id.* She opined Plaintiff was likely to be off-task twenty percent of a typical workday. *Id.* She also opined Plaintiff would likely miss about four days of work per month. (Tr. 357). In her description, she noted: "[a]ctive psychosis is prominent in this case and internal stimuli . . . distract her frequently as observed at every counseling session." *Id.*

Testimony and Reports

*Disability Report*

In a November 2014 disability report, Plaintiff reported she needed others to encourage daily hygiene, and her depression made it hard for her to get out of bed. (Tr. 215). She reported difficulty being in public places, and "functioning in [a] social manner." *Id.* Plaintiff needed help cooking, cleaning, remembering to take her medications, and going to medical appointments. (Tr. 218). Plaintiff also reported a diagnosis of obsessive compulsive disorder from January 2014, and she continued to hear voices. (Tr. 220).

*Third-Party Statements*

Both of Plaintiff's parents wrote letters in November 2014. (Tr. 223-25, 229-30). Her mother reported she was "an energetic child and adult until 2000." (Tr. 223). She lost her last job after yelling at her boss and another employee. *Id.* Plaintiff's mother reported Plaintiff's mental health worsened until October 2013 when she was pulled over at night for driving with no headlights. *Id.* She was ultimately hospitalized as a result. *Id.* Plaintiff's father reported Plaintiff had difficulty being in crowds and public places. (Tr. 229). He reported it was hard to get her attention, and that she could be loud and disruptive while others are sleeping. *Id.* Plaintiff's father reported Plaintiff's medications had caused improvement, "but not enough", and that she was sleeping more, and more inactive. (Tr. 230). He reported Plaintiff "still hear[d] voices occasionally", and did not believe she could obtain a job. *Id.* Both parents reported Plaintiff had difficulty maintaining her finances. (Tr. 224, 229).

*Hearing Testimony*

At the March 2016 hearing, Plaintiff testified she had not worked in the past twelve years. (Tr. 52, 54). She testified to past work as a conservation coordinator at a museum, at a nature conservancy, and at a research institute. (Tr. 55-56). At the time of the hearing, she lived with her mother and grandfather. (Tr. 65).

Plaintiff testified she was unable to work due to mental health issues including schizophrenia and obsessive compulsive disorder ("I hear voices, and I experience spirits move through me."). (Tr. 56).[5] She first sought treatment in 2014 (Tr. 57), and had not sought treatment earlier because she "was afraid to admit" she needed help (Tr. 58). She also testified to hearing voices constantly, specifically the voices of two former bosses. (Tr. 58-60, 63). At the time of the

---

5. Plaintiff also testified to physical limitations which are not at issue here.

hearing, Plaintiff testified she heard one of them, but the voice was "not very clear." *Id.* The voices interfered with her sleep. (Tr. 60) ("[T]hey put up a racket, and I can't - - and they disturb me. And they're mentally disturbing to me, and I can't . . . get to sleep."). Plaintiff testified the voices made it difficult for her to concentrate or complete tasks. (Tr. 62-63).

At the time of the hearing, Plaintiff took Prozac, Zoloft, Zyprexa, and Inderal, which had all been prescribed by the nurse practitioner at Beacon Health. (Tr. 63).

Plaintiff testified she read and colored "a little bit." (Tr. 64). She also went to church about once every two months with her mother. (Tr. 64-65). Her mother woke her in the mornings, and helped with her medications, cooking, and cleaning. (Tr. 65-66). Plaintiff had one friend she had seen once in the recent past, but had not spoken to her since. (Tr. 68). Plaintiff testified she avoids crowds, but it was not difficult for her to come to the hearing. (Tr. 70).

Plaintiff testified she did not like her situation, and would rather be working. (Tr. 72). She wanted to obtain work in her field. (Tr. 73-75). She testified that she thought she "would be able to handle a routine job where you did repetitive tasks." (Tr. 76).

VE Testimony

A vocational expert appeared and testified at the hearing before the ALJ. (Tr. 78-90). The ALJ asked the VE to consider an individual with Plaintiff's age, education, and work experience, who was limited in the way ultimately found by the ALJ's RFC. (Tr. 84-85). The VE testified such an individual could not perform Plaintiff's past work, but could perform other jobs in the national economy. (Tr. 85-86).

The VE also testified that if a person were consistently off-task twenty percent of the workday, or missed work three days per month, no jobs would be available. (Tr. 86-87).

12

ALJ Decision

In his May 4, 2016 decision, the ALJ found Plaintiff met the insured status requirements of the Social Security Act through March 31, 2009, and had not engaged in substantial gainful activity since her alleged onset date of July 15, 2004. (Tr. 21-22). She had severe impairments of schizoaffective disorder, urine incontinence, obsessive-compulsive disorder, depression, and bipolar disorder, but these impairments did not meet or medically equal the severity of a listed impairment individually or in combination. (Tr. 22). After consideration of the record, the ALJ concluded Plaintiff had the mental RFC to:

> perform simple routine tasks that do not have fast paced production quotas; the claimant can interact superficially with others where superficial means the job cannot require arbitration, negotiation, or conflict resolution, management, or supervision of others or responsibility for the health, safety, or welfare of others; the claimant requires a static work environments with no more than occasional changes; and the claimant requires a restroom on the premises.

(Tr. 25).[6] He then concluded Plaintiff was unable to perform her past relevant work as a research associate, forester, and biologist. (Tr. 33). However considering her age, education, work experience, and RFC, she could perform other jobs that exist in significant numbers in the national economy. (Tr. 34). Therefore, the ALJ concluded Plaintiff was not disabled from her alleged onset date of July 15, 2004, through the date of his decision. (Tr. 35).

STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence

---

6. The RFC also contained other physical restrictions not at issue here. *See* Tr. 25.

is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

### STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a) & 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. §§ 404.1520 and 416.920—to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

14

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f) & 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

### DISCUSSION

Plaintiff alleges two errors in the proceedings before the ALJ: 1) the ALJ failed to properly consider the opinions of Ms. Mowry, Ms. Niazi, and Ms. Pane; and 2) the ALJ lacked jurisdiction to rule on Plaintiff's SSI application. The Commissioner responds that the ALJ properly evaluated the evidence from the three listed providers, and did not violate due process in joining Plaintiff's DIB and SSI applications. For the reasons discussed below, the undersigned recommends the Commissioner's decision be reversed and remanded for further proceedings as described herein.

Opinion Evidence

Plaintiff first challenges the ALJ's consideration of the opinions of Ms. Mowry, Ms. Niazi, and Ms. Pane. For the reasons discussed below, the undersigned finds no error in the ALJ's consideration of Ms. Mowry's opinion, but recommends the case be remanded for further consideration of the opinions of Ms. Niazi and Ms. Pane.

Social Security regulations state that "[r]egardless of its source, we will evaluate every medical opinion we receive." 20 C.F.R. §§ 404.1527(c), 416.927(c). A "medical opinion" is defined by regulation as a "statement[] from physicians and psychologists or other acceptable

medical sources that reflect judgments about the nature and severity of your impairments . . . ." *Id.* at §§ 404.1527(a)(2), 416.927(a)(2). "Acceptable medical sources" includes licensed physicians, licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists. *Id.* at §§ 404.1513(a)(1)-(5); 416.913(a)(1)-(5). The relevant Social Security Regulation also explains:

> The distinction between "acceptable medical sources" and other health care providers who are not "acceptable medical sources" is necessary for three reasons. First, we need evidence from "acceptable medical sources" to establish the existence of a medically determinable impairment. See 20 CFR 404.1513(a) and 416.913(a). Second, only "acceptable medical sources" can give us medical opinions. See 20 CFR 404.1527(a)(2) and 416.927(a)(2). Third, only "acceptable medical sources" can be considered treating sources, as defined in 20 CFR 404.1502 and 416.902, whose medical opinions may be entitled to controlling weight. See 20 CFR 404.1527(d) and 416.927(d).

> Making a distinction between "acceptable medical sources" and medical sources who are not "acceptable medical sources" facilitates the application of our rules on establishing the existence of an impairment, evaluating medical opinions, and who can be considered a treating source.

SSR 06-03p, 2006 WL 2329939, at *2.[7]

Opinions from those who are not "acceptable medical sources"—or as the regulations define them, "other sources"—may be used by an ALJ to "show the severity of [a claimant's] impairment(s) and how it affects [the claimant's] ability to work." 20 C.F.R. §§ 404.913(d), 416.1513(d); *see also Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 541 (6th Cir. 2007). Other source opinions are entitled to consideration by an ALJ, and an ALJ's decision should reflect such consideration. *Cole v. Astrue,* 661 F.3d 931, 939 (6th Cir. 2011); *see also* SSR 06-03p, 2006 WL 2329939, at *3 (explaining "other source" opinions "are important and should be evaluated on key

---

7. SSR 06-03p was rescinded effective March 27, 2017, *see Notice of Rescission of Social Security Rulings*, 82 Fed. Reg. 15263-01 (March 27, 2017), but was in effect at the time of the ALJ's decision, and as such, applies here.

16

issues such as impairment severity and functional effects, along with other relevant evidence in the file"). In other words, an ALJ "should explain the weight given to [such] opinions ... or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case." SSR 06-03p, 2006 WL 2329939, at *6; *see also Cruse,* 502 F.3d at 541.

"SSR 06-03p . . . does not require that an adjudicator articulate 'good reasons' for the rejecting of an 'other source's' opinion[,]" as the ALJ must do when discounting an opinion by a treating source. *York v. Comm'r of Soc. Sec.,* 2014 WL 1213240, at *5 (S.D. Ohio) (citations omitted). Nor is an "other source" opinion "entitled to any special deference." *Hill v. Comm'r of Soc. Sec.*, 560 F. App'x 547, 558 (6th Cir. 2014). And, an ALJ has "broad discretion" in weighing "other source" opinion. *Brown v. Comm'r of Soc. Sec.*, 591 F. App'x 449, 451 (6th Cir. 2015).

However, to evaluate other source opinions, an ALJ should apply the factors set forth in 20 C.F.R. §§ 404.1527(c) and 419.927(c), *i.e.,* length of treatment history; consistency of the opinion with other evidence; supportability; and specialty or expertise in the medical field related to the individual's impairment(s). *Adams v. Colvin*, 2014 WL 5782993, at *8 (S.D. Ohio); SSR 06-03p, 2006 WL 2329939, at *4-5. And, "[g]iven this guidance, 'it will rarely be enough for the commissioner to silently "consider" the above-mentioned factors in deciding how much weight to give to an "other source" who has seen the claimant in the source's professional capacity." *Hirko v. Colvin*, 2016 WL 4486852, at *3 (N.D. Ohio) (quoting *Estep v. Comm'r of Soc. Sec.*, 2016 WL 1242360, at *3 (E.D. Mich.)).

*Ms. Mowry*

Plaintiff first contends the ALJ 's opinion is "devoid of any analysis of Ms. Mowry['s] . . . opinions regarding [Plaintiff's] mental functioning." (Doc. 15, at 17). The Commissioner responds that the ALJ properly considered Ms. Mowry's opinion.

Although the ALJ did not separately address Ms. Mowry's "Daily Activities Questionnaire", he referenced it, and indeed relied upon it throughout his opinion, both in the listing analysis, and the RFC analysis. *See* Tr. 23 ("The claimant alleges that her impairments lead to confusion, disorganized thoughts, poor self-awareness, and impulse shopping."; "Despite the claimant's symptoms, records indicate that she prepared simple meals, could do household chores when encouraged, drove a car, and was reliable in keeping appointments."; and "The claimant alleges that her impairments lead to confusion, poor follow through with tasks, disorganized thoughts, lack of motivation, low energy, and poor self awareness.") (citing, each time, Tr. 211-12); Tr. 23-24 ("Despite the claimant's symptoms, records indicate that she drove a car, was reliable in keeping appointments, and showed improved functionality on her psychiatric medications.") (citing Tr. 211-12); Tr. 26 ("Records indicate that the impairments lead to confusion, poor follow through with tasks, disorganized thoughts, lack of motivation, verbal altercations with family members and a previous employer, low energy, poor self-awareness, and impulse shopping[.]" and "Despite the claimant's symptoms, records indicate that she drove a car, was reliable in keeping appointments, and showed improved functionality on her psychiatric medications.") (citing Tr. 211-12); Tr. 32 ("Despite the claimant's symptoms, records indicate that she drove a car, was reliable in keeping appointments, and showed improved functionality on her psychiatric medications.") (citing Tr. 211-12). Although the ALJ used similar language each time, it encapsulates most of what Ms. Mowry wrote on the form.

18

Thus, the ALJ's decision reflects consideration of Ms. Mowry's opinion, and shows that the ALJ complied with SSR 06-03p, in "evaluat[ing] . . . [it] on key issues such as impairment severity and functional effects, along with other relevant evidence in the file". 2006 WL 2329939, at *3. Therefore, the undersigned finds no error in the ALJ's consideration of Ms. Mowry's Daily Activities Questionnaire.

*Ms. Pane*

Plaintiff asserts the ALJ's consideration of treating therapist Ms. Pane's opinion is not supported by substantial evidence. The Commissioner contends the ALJ did not err.

The ALJ addressed Ms. Pane's "Mental Impairment Questionnaire":

> Nanci Pane, L.P.C.C.-S indicated that the claimant would miss four days per month and be off-task at least 20 percent of the time due to psychosis [citing Tr. 353-57]. A licensed professional clinical counselor is not an acceptable medical source under Social Security regulation 404.1513. The remaining limitations should not happen if the claimant is compliant with her medication and days missed is speculative. Accordingly, this opinion is given little weight.

(Tr. 32). The ALJ is correct that a counselor is not an acceptable medical source. However, the ALJ's statement that he gave Ms. Pane's opinion little weight because "[t]he remaining limitations should not happen if the claimant is compliant with her medication" (Tr. 25), is not supported by substantial evidence. The ALJ cited no record evidence for this statement, and it is unclear what in the record shows that if Plaintiff maintains medication compliance, she would not miss work or be off-task as opined by Ms. Pane. Further, neither the Commissioner now, nor the ALJ in his opinion, point to anything suggesting Plaintiff was not medication-compliant. Further, in support of her opinion, Ms. Pane noted: "[a]ctive psychosis is prominent in this case and internal stimuli . . . distract her frequently as observed at every counseling session." (Tr. 357).

19

Without this reason, the only reason provided for giving the opinion little weight is that Ms. Pane is not an acceptable medical source. However, discounting an opinion solely based on its source is insufficient. *See, e.g.*, *Randazzio v. Comm'r of Soc. Sec.*, 2015 WL 881511, at *3 (S.D. Ohio); *see also Cruse*, 502 F.3d at 541. Therefore, the undersigned recommends the Commissioner's decision be reversed and remanded to further address this opinion.

*Ms. Niazi*

Finally, in conjunction with her argument about Ms. Mowry's opinion, Plaintiff similarly contends the ALJ's opinion is "devoid of any analysis of . . . Ms. Niazi's opinion[] regarding [Plaintiff's] mental functioning." (Doc. 15, at 17). The Commissioner responds that the ALJ adequately considered this opinion. The ALJ accurately summarized this opinion in his decision, although he misidentified its author as Ms. Pane rather than Ms. Niazi:

> Ms. Pane also indicated that the claimant might be able to do simple and repetitive tasks and that her mental status was normal except that the claimant was goal oriented by realities that were somewhat disturbed. She also concluded that the claimant can remember, understand, and follow only simple instructions, complete only simple tasks, and maintain attention for only short periods. Ms. Pane also reported that the claimant is okay with social interaction [citing Tr. 350-52].

(Tr. 32). He then provided an explanation for discounting that opinion:

> As noted earlier, a licensed professional clinical counselor is not an acceptable medical source under Social Security regulation 404.1513. Further, the medical records do not support such a degree of limitation. Accordingly, this opinion is given little weight.

(Tr. 32).

Because remand is already required to adequately address Ms. Pane's opinion, as described above, the undersigned also recommends the Commissioner also be required to further address Ms. Niazi's opinion on remand.   Although the Commissioner is correct that a nurse practitioner (like Ms. Niazi) *and* a counselor (like Ms. Pane) are both not acceptable medical sources, the ALJ's

misidentification of the opinion's author indicates he believed the opinion to be authored by Ms. Pane. It is impossible to tell from the decision whether this error would have affected the ALJ's weighing of this opinion. First, Ms. Pane had only treated Plaintiff for two months, whereas Ms. Niazi treated her longer. Second, Ms. Niazi prescribed Plaintiff's medications. Third, even disregarding the misidentification, the ALJ's reasons for assigning this opinion "little weight" are unclear. The rationale provided: "the medical records do not support such a degree of limitation" is unaccompanied by any citation. And, as Plaintiff points out, the opinion is actually "quite similar" (Doc. 19, at 19), to the ALJ's RFC. *Compare* Tr. 25 (RFC determination including "simple routine tasks that do not have fast paced production quotas"; "superficial[]" interaction and "static work environment."), *with* Tr. 351 (opining Plaintiff could perform "simple tasks only" for a "short period of time", and that she could "maybe . . . do tasks [that are] repetitive and simple").

Because of the opinion author confusion, and more so because remand is already required to properly address Ms. Pane's opinion, the undersigned recommends the Commissioner be required, on remand, to also further explain the consideration of Ms. Niazi's opinion.

Although other source opinion such as that from Ms. Pane and Ms. Niazi is not "entitled to any special deference", *Hill*, 560 F. App'x at 558, the ALJ's reasoning must still be supported by substantial evidence. For the reasons stated above, the undersigned finds it is not. The undersigned notes evaluating opinions from other sources such as these may be of particular importance in a case such as this one where there is no additional opinion evidence from any medical provider in the record.

Due Process Claim

In her second argument, Plaintiff contends the ALJ violated due process in escalating her SSI claim to the hearing level, such that the claim was never considered at the initial or reconsideration levels of review. The Commissioner responds that there is no such error, because the DIB and SSI claims involved a "common issue", and Plaintiff repeatedly requested that the ALJ consider her DIB and SSI claims together. The undersigned agrees with the Commissioner.

Plaintiff asserts that "[b]ecause of the remote date last insured, the two claims do not have a common issue" and thus "the only way the ALJ should have escalated the SSI application is if he were ruling in [Plaintiff's] favor," (Doc. 15, at 20) (citing Soc. Sec. Admin., Program Operations Manual System ("POS"), DI 12045.010 *Processing Disability Claims at Different Levels of Appeal, Title II and Title XVI – Common Issue Cases*, *available at*: https://secure.ssa.gov/apps10/poms.nsf/lnx/0412045010). The cited manual provision provides:

> For purposes of escalation and consolidation, a common issue is present when two or more claims, in any combination, share any overlapping period of time, and all have the same medical or substantial gainful activity (SGA) issue.
>
> When a claim for benefits based on disability under title II or title XVI is pending at the initial, reconsideration, or hearing level of review and a subsequent claim under the other title is filed, the field office (FO) should establish whether the claims share a common issue so that the subsequent claim can be considered at the same level as the prior claim. Both claims will not be considered at the hearing level if the Administrative Law Judge (ALJ) does not agree that there is a common issue or that the claim should be joined, or if the claimant objects to joining the claims.

POMS DI 12045.010.

Plaintiff appears to be correct that her SSI and DIB applications did not meet the definition from the POMS of a "common issue". This is so because her date last insured for her DIB claim was in 2009, and her SSI claim had a protective filing date of July 7, 2014. Thus, they did not "share any overlapping period of time". POMS DI 12045.010. However, it is unnecessary to

determine whether a violation of the POMS occurred because POMS guidelines are not legally binding on the Court, *Davis v. Sec'y of Health & Human Servs.*, 867 F.2d 336, 340 (6th Cir. 1989), and they "do not bind the Commissioner," *Tejada v. Apfel*, 167 F.3d 770, 775 (2d Cir. 1999) (internal quotation omitted). And, "the Agency's failure to follow a POMS procedure does not give rise to a due process violation." *Ball v. Colvin*, 2013 WL 5886604, at *7 (D. Ariz.) (citing *Lowry v. Barnhart*, 329 F.3d 1019, 1023 (9th Cir. 2003)).

The Supreme Court has stated that the "fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)). Additionally, the Sixth Circuit has held that disability claimants are entitled to due process at the hearing level because they have a property interest in any potential benefit. *Flatford v. Chater*, 93 F.3d 1296, 1304 (6th Cir. 1996). To that end, an ALJ must ensure that the hearing is "full and fair." *Id.* at 1306; *see also Stoner v. Sec'y of Health & Human Servs.*, 837 F.2d 759, 760-61 (6th Cir. 1988) (a social security claimant must "receive meaningful notice and an opportunity to be heard before his claim for disability benefits can be denied."). Here, Plaintiff was provided notice, and a hearing before an ALJ. And Plaintiff has cited no legal authority to support her position that the failure to obtain "an initial and reconsideration determination on the issues specific to her [SSI] application" (Doc. 15, at 20), violates due process.

Further, neither Plaintiff nor her attorney at the hearing level ever objected to the consideration of the SSI claim at the hearing level. *See* Tr. 53 (attorney addressing DIB and SSI together); Tr. 121-22 (letter from attorney to Social Security Administration noting both DIB and SSI claims); Tr. 242-45 (request for review by Appeals Counsel, challenging ALJ's determination

on both SSI and DIB together). Indeed, at the hearing, the ALJ and counsel discussed the elevation

of the SSI claim:

> ALJ:   * * * Now, just procedurally, Counsel, do you have any idea how the case got expedited up from the Title XVI? Did someone request that, or - -

> ATTY: I actually don't know, Your Honor. I - - this was Mr. Remax's [phonetic] case, and I - - so I'm not that terribly familiar with the procedural end of the - -

> ALJ:   Okay.

> ATTY: - - Title XVI app. I don't know if it was escalated or - -

> ALJ:   Well, I didn't see- - there was no consultative examinations in the record. There's no - - you know, we have state agency reviewers who have looked at the exhibits.

(Tr. 88). Although Plaintiff's counsel did not know why the SSI case was escalated, he also did

not offer any objection to the process.

Because Plaintiff received the required notice and opportunity to be heard, the undersigned

recommends the court find there was no due process violation resulting from the escalation of

Plaintiff's SSI claim to the hearing level.

CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, the

undersigned finds the Commissioner's decision denying SSI and DIB not supported by substantial

evidence and recommends the decision be reversed and remanded for further proceedings.


   s/James R. Knepp II             
United States Magistrate Judge


*ANY OBJECTIONS* to this Report and Recommendation must be filed with the Clerk of Court

within fourteen days of service of this notice. Failure to file objections within the specified time

WAIVES the right to appeal the Magistrate Judge's recommendation. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).